## CHISWELL v. JOHNSTON et al.

(Court of Appeals of District of Columbia. Submitted February 8, 1924. Decided May 5, 1924. Rehearing Denied June 14, 1924.)

No. 4010.

**1. Fraudulent conveyances ☞301(2)—Evidence held to establish conspiracy between decedent and transferee of stock to defeat creditors' claims.**

In action by administrator to recover property belonging to decedent's estate, to satisfy creditors' claims, evidence as to transfer of stock under verbal trust agreement *held* to establish conspiracy between decedent and transferee to defeat creditors' claims.

**2. Trusts ☞17, 18(1)—Writing essential to create trust effective against third parties.**

Under Code, § 1118, a writing is essential to create a trust effective against third parties.

**3. Equity ☞64—Equity should guard against opening doors to those negligent in asserting their rights.**

Courts should guard against opening doors to complainants who have been guilty of negligence in asserting their rights, at least after actual or constructive notice of existence of damaging situation.

**4. Fraudulent conveyances ☞249—Action to recover property held not barred by laches.**

An action by administrators to recover property belonging to decedent's estate, to satisfy creditors' claims, where fraud in transferring stock in question was actual, and there was no acquiescence in it, and stock had not increased in value, and was not in the hands of innocent party, *held* not barred by laches.

**5. Equity ☞87((1)—Statutes of limitations no bar in case of fraud.**

Fraud creates an exception to the rule that courts of equity in cases of concurrent jurisdiction consider themselves bound by statutes of limitations governing actions at law.

**6. Equity ☞80—In case of fraud, lapse of time is of little concern.**

Where fraud grows out of conspiracy to defraud creditors, mere lapse of time, in absence of failure to act on notice of fraud, is of little concern.

**7. Equity ☞72(1)—Lenient in sustaining action against plea of laches, where no damage shown.**

Where no damage is shown, equity will be much more lenient in sustaining a right of action as against a plea of laches than where delay has caused irreparable damage.

Smyth, Chief Justice, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Suit by Edgar B. Chiswell, administrator of the estate of Rozelle E. Johnston, deceased, against Lee M. Johnston and others. Decree for defendants, and plaintiff appeals. Reversed, and cause remanded, with directions to enter decree for complainant.

R. H. McNeill, of Washington, D. C., for appellant.

J. C. Gittings and T. M. Gittings, both of Washington, D. C., for appellees.

Before SMYTH, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice.   [1] On July 9, 1919, appellant, plaintiff below, was appointed administrator of the personal estate of one Rozelle E. Johnston, deceased, upon a creditors' petition filed by C. H. Ellison, H. A. Edwards, W. J. Thackston, H. J. Haynesworth, and W. W. Bourne, to whom it is alleged Johnston was indebted, at the time of his death, in the sum of over $100,000, as evidenced by a judgment against the deceased held by Edwards, Thackston, and Haynesworth, $29,000 to Ellison for money loaned and advanced for services rendered, and for one-third of the profits realized from the sale of certain stock in a corporation known as the East Lake Lumber Company, and $14,000 to Bourne for money loaned and advanced, and for services rendered.

The administrator, when called upon to pay the above claims, filed the bill of complaint in this cause in the Supreme Court of the District of Columbia, alleging that the decedent, Johnston, at the time of his death, was the owner of a large estate, consisting of cash, stocks, bonds, securities, etc., aggregating about $100,500, which property is subject to the payment of the outstanding indebtedness against said estate; that in addition thereto decedent at the time of his death was entitled to receive certain moneys illegally alleged to have been withheld from him by defendant John C. Gittings, trustee, approximating $200,000.

It is further alleged that the decedent, Johnston, at the time of his death, owned a large amount of stock in the East Lake Lumber Company, of the par value of $300,000, which stock it is alleged was carried on the books of the corporation in the name of Gittings as trustee. It is further alleged that Johnston and Gittings, about the year of 1908, conspiring to defraud the creditors of Johnston, entered into an agreement by which the stock of the East Lake Lumber Company, which belonged to Johnston, should be carried upon the stockbooks of the company in the name of Gittings as trustee, when in truth and in fact no trust in law or in equity existed between them.

The plaintiff prayed, among other things, that John C. Gittings, alleged trustee, be required to answer the bill, and to discover and account for all the funds, stocks, bonds, securities, or other property by him received and held under the alleged trust agreement, as well as a full account of all disbursements made by him, and to whom made, and for what account, and to show cause why he should not surrender to the court all the funds, stocks, bonds, securities, accounts, or other property in his hands, under said alleged trust, and for other and further relief.   From a decree dismissing the bill, plaintiff has prosecuted this appeal.

It appears that in 1904 Edwards, Thackston, Haynesworth, and Johnston were jointly interested in securing the sale of a tract of timber land in Dare county, N. C.   Johnston, without the knowledge of his associates, purchased the land for $125,000, with a cash payment of $2,000, organized the East Lake Lumber Company, and in exchange for a majority of the full-paid stock, assigned the contract of sale over to the company.   Edwards and Thackston brought suit in North Carolina against the East Lake Lumber Company and Johnston and

Haynesworth, asserting an interest in the land and the stock of the company. The suit resulted in a judgment for the defendants. In November 1908, Edwards, Thackston, and Haynesworth brought suit in South Carolina against Johnston for breach of the original contract, and on November 20, 1911, secured a judgment for $100,000. Edwards et al. v. Johnson, 90 S. C. 90, 72 S. E. 638. Various attachment suits were instituted by the judgment creditors in South Carolina, extending up to the year 1915, against stock and property of Johnston in that state, from which was recovered approximately $26,-000, which was applied toward the satisfaction of the $100,000 judgment.

The testimony in the present case conclusively shows that, after enforcing the attachments in South Carolina, diligent efforts were made to locate property belonging to Johnston elsewhere. An effort was made to ascertain if any property could be found in the District of Columbia, where Johnston resided. Counsel was employed for this purpose. A member of the Pinkerton Detective Agency was employed to ascertain if any property belonging to Johnston could be located, all of which investigations failed to disclose any property available for the satisfaction of the South Carolina judgment.

Coming to the charge of fraud, Gittings testified that in January or February, 1908, Johnston delivered to him 2,563 shares of stock in the East Lake Lumber Company, with the request that he hold it in trust for the benefit of Johnston's wife, children, and two sisters. Gittings further testified that there was a written declaration of trust made at this time, which had been lost. He also testified that he placed the stock in a box, where it remained until 1909, when upon examination he found he had other securities which were not part of the trust. He testified that he made another declaration of trust at this time, and did not count the shares of stock that belonged to Johnston, or the shares which belonged to other people. This declaration of trust contains nothing to indicate that the stock was held for the benefit of Johnston's family. After certifying that 150 shares of the stock belonged to the firm of Gittings & Chamberlain for legal services rendered; that 18 shares of stock, in the name of one James J. Lampton, were held by Gittings as trustee for Mrs. Ellicot; and that—

"the balance of the certificates of the shares of stock contained in this envelope are held by me as trustee, with full discretionary power to vote and dispose of for the benefit of others whose names are known only to Colonel Johnston and myself. I direct that if anything should happen to me so that I should be unable to perform the trust imposed in me, that all of said certificates of stock, with the exception of the 150 shares standing in the name of R. E. Johnston hereinabove referred to, and the two certificates standing in the name of Jas. E. Lampton, hereinabove referred to shall be delivered to Colonel R. E. Johnston, as he has agreed with me and the cestui que trustants to carry out this trust.

"August 31, 1909.

"[Signed]                                                    John O. Gittings."

It further appears that, when Gittings received the stock in 1908, the 27 certificates, representing 2,563 shares, were indorsed in blank by "R. E. Johnston," and dated "May 8, 1907," and witnessed by "H. A. Arnold." It is unnecessary to consider whether such an indorse-

ment, accompanied by delivery, would pass title, since it is not contended that title was to pass to Gittings. He says he received it to be held in trust; therefore, the equitable title remained in the cestui que trust. The certificates remained so indorsed in blank until April 10, 1917, when, at the request of Gittings, the words "John C. Gittings, as trustee for Johnstons," were written by Alexander Muncaster on the indorsement of each certificate of stock over the signature. On April 11, 1917, the certificates were surrendered by Gittings and reissued in one certificate, No. 169, for 2,563 shares, to "John C. Gittings, as trustee for Johnstons." This indorsement and transfer took place after the sale of the land of the East Lake Lumber Company to one Montgomery, through Julian E. Gittings, a brother of defendant John C. Gittings. During all of this period Gittings was president of the East Lake Lumber Company, and, under a contract of sale with Julian E. Gittings, the stock in question was deposited in escrow from 1911 to 1917 with the Maryland Trust Company of Baltimore, Md.

In March, 1917, Julian E. Gittings succeeded in selling the land belonging to the East Lake Lumber Company, and the net proceeds of the sale, $200,000, were paid over to the lumber company. Out of this John C. Gittings received an attorney's fee of $25,000, and in addition from Julian E. Gittings, as a part of certain obligations against the East Lake Lumber Company, which he assumed to pay over and above the $200,000, $20,000 as attorney's fee, $5,000 for services as president of the company, and $2,600 for expenses, making a total paid to Gittings of $52,600. It further appears that Gittings, as trustee, received, out of the $200,000, $84,950, and that $74,715 of this amount cashed in at the rate of $29.50 per share, represented the stock held, as trustee, in the East Lake Lumber Company. Out of the $200,000 Johnston personally received $21,816. Out of these funds Gittings made certain disbursements subsequent to the appointment of the plaintiff as administrator, and one disbursement after this suit was filed.

Coming, now, to the evidence of the concerted efforts of Johnston and Gittings to lull the creditors of Johnston into inactivity: Bourne testified that Johnston told him that he had turned the stock "over to Mr. Gittings and did not have a scrap of paper to show for it." He also said that—

"they were bringing actions against him in the courts, and bringing judgments against him in the courts, and he wanted to protect his interest."

The witness McDowell testified that Johnston told him in 1911 that he "owned a majority of the stock of the East Lake Lumber Company, that he had made it over to Gittings for his (Johnston's) own protection, and that he (Johnston) could get it back when he demanded it, and that as late as 1916 Johnston stated to him that Gittings merely held the stock for his (Johnston's) protection." The witness Lassiter testified that Johnston told him:

"Gittings held this stock for him in trust for his benefit and protection."

Ellison testified that:

"Col. Johnston told him he had put all the stuff he had in Col. Jack Gittings' hands; that Jack was his attorney and a personal friend, and an

all right fellow, and he had done it so that these fellows down there in South Carolina couldn't touch him; that he had it fixed so that they couldn't get as much as a postage stamp out of him."

It further appears from the testimony of Haynesworth that Gittings told him in Greenville, S. C., in 1910 or 1911, that Johnston had gotten rid of everything he had, had run through with it, and had disposed of all his stock in the East Lake Lumber Company, excepting a small amount on which he had borrowed full value from a Baltimore bank. Gittings also testified in July, 1913, in a suit brought in South Carolina by the Border State Lumber Company against Edwards, Thackston, and Haynesworth, that Johnston was at that time insolvent. In the same deposition he testified:

That in 1905 Johnston owned a controlling interest in the East Lake Lumber Company; "that the capital stock of the East Lake Lumber Company is $500,000. Q. Does he own any of the stock now? (referring to the date of the deposition, July, 1913). A. I don't think he owns a share of it, not to my knowledge. I say it is hard to tell what Col. Johnston owns to-day. I can tell you what he owned yesterday, or the last time I saw him, probably."

It will be observed that no notice was brought home to Edwards, Thackston, and Haynesworth, the South Carolina judgment creditors, that Johnston had turned the stock over to Gittings. On the contrary, Gittings had led them to believe that Johnston had dissipated the stock and was insolvent. The notice to Ellison and Bourne to the effect that Johnston had turned the stock over to Gittings is not important, since, as will later appear, their claims were payable out of the proceeds of the sale of the land. These two claims, therefore, were not due until the land was sold in 1917 about two years before the petition for the appointment of an administrator was filed. The statements of Johnston to the various witnesses are important only as showing the motive in turning the stock over to Gittings.

It further appears that Gittings about a year after the sale of the property in 1917, undertook to make a written declaration of trust in favor of the wife and heirs at law of Johnston in which he certified that:

"There came into my hands in 1908, and at other dates subsequent thereto, certain shares of stock and a sum of money, to be held and applied by me for the use and benefit of the following named parties: Lee M. Johnston, Roland L. Johnston, Bertha J. Clever, Harvey Clever, Eva Johnston, and Euphemia Moon—with full discretionary power in relation to the investment, reinvestment, application of income, and the final disposition of the corpus thereof, with the right to select and nominate a successor to administer said trust."

Then follows a statement of the disbursement to be made of the property between the parties named, with a reservation on the part of Gittings to use any of the corpus of the respective shares for the use and benefit of the individuals named. It then concludes as follows:

"I hereby now nominate and appoint to administer the foregoing trust, in the event of my death, Alexander Muncaster, of Washington, D. C., in whom I repose the utmost confidence. In witness whereof I have hereunto set my hand, this 20th day of June, A. D., 1918.

"[Signed]                                    John C. Gittings, Trustee."

The claim of Ellison is based upon a contract entered into with Johnston June 19, 1915, in which Johnston represented that he had a sale pending for the North Carolina lands, that he was in need of money to help make the sale, and that the money advanced by Ellison should be refunded out of the proceeds of the sale when consummated. By the contract Johnston assigned to Ellison "one-twelfth interest in said property or stock." Upon the strength of this it appears that Ellison advanced over $4,000. The payments extended up to September 7, 1916.

The claim of Bourne is based upon a memorandum agreement, dated April 1, 1915, between one C. A. Yeager, of the first part, and Johnston and Bourne, of the second part, which provided that, upon the sale of the East Lake Lumber Company, the parties—

"shall divide the profits over and above the cost price of the above property between them as follows: Three-fourths to said C. A. Yeager, and one-fourth to the said R. E. Johnston and W. W. Bourne."

Inasmuch as the present action was brought to recover and bring into the possession of the administrator the property belonging to the estate of Rozelle E. Johnston, we are not here concerned with the amount or validity of the claims of the respective creditors. These are matters for the determination of the probate court when the claims are presented for allowance.

The South Carolina court adjudged Johnston guilty of fraud in secretly purchasing the land in 1904, and later in refusing to make settlement with his associates. We think that the record clearly discloses that Gittings became a party to this fraud in 1908, when he received the stock indorsed in blank from Johnston, and consistently held it in such manner as not only to lull the creditors of Johnston into inactivity, but to defeat any attempt that they might make to recover upon it.

[2] The verbal trust relation which existed between Gittings and Johnston is without force or effect to defeat the creditors of Johnston. Nowhere in this record is there any writing by which Johnston created Gittings his trustee. This is essential to create a trust effective against third parties in this District. Code D. C. § 1118. Undoubtedly, by the delivery of the stock under the circumstances detailed, Gittings became the trustee of Johnston; but this could not afford any protection against the creditors of Johnston or legalize a verbal declaration of trust in favor of Johnston's family. Gittings had not been legally vested with power as trustee to dispose of the estate of his cestui que trust; hence he could not, without the concurrence of Johnston, have made a valid declaration of trust in favor of Johnston's family, as was attempted in the document of 1918. Presumably this document was executed upon the supposition that its legality could be sustained by reason of the fact that the stock was then in the name of Gittings; but it will be observed that the original stock was surrendered and a new certificate of stock issued in the name of Gittings, without any apparent knowledge or concurrence on the part of Johnston. A trustee cannot juggle the property of his cestui que trust in this way. Certainly not to the prejudice of the rights of creditors.

Johnston's transaction in the purchase of the land in 1904, and the manner in which he treated his associates, was found to be a fraud by the courts of South Carolina. The delivery of the stock to Gittings was originally made while the original suit in North Carolina was pending. Gittings was cognizant of that litigation and of the relations there disclosed as existing between Johnston and his associates. Gittings took part in the South Carolina litigation, and later, in 1913, in the suit of the Border State Lumber Company, testified that Johnston was insolvent. These facts, together with the manner in which the proceeds of the sale of the land in 1917 were handled by Gittings, who for several years had been acting as president of the East Lake Lumber Company, conclusively establish in our opinion a conspiracy between Johnston and Gittings to defeat the creditors of Johnston, especially the judgment creditors growing out of the South Carolina litigation.

[3] This brings us to the question of laches. Undoubtedly courts should guard against opening the doors to complainants, who have been guilty of negligence in asserting their rights, at least after actual or constructive notice of the existence of the damaging situation. As the court said in McIntire v. Pryor, 173 U. S. 38, 59, 19 Sup. Ct. 352, 360 (43 L. Ed. 606):

"We do not wish to be understood as holding that the plaintiff, even in the case of actual fraud, may wait an indefinite time, or always so long as the statute of limitations would permit him to bring an action at law before asserting his rights; but, where the fraud is clearly proven, the court will look with much more indulgence upon any disability under which the plaintiff may labor as excusing his delay."

Or as was said in Townsend v. Vanderwerker, 160 U. S. 171, 186, 16 Sup. Ct. 258, 262, 40 L. Ed. 383:

"The question of laches does not depend, as does the statute of limitation, upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under all the circumstances of the particular case, plaintiff is chargeable with a want of due diligence in failing to institute proceedings before he did."

[4] It appears that until 1915 the judgment creditors were attempting to recover upon the South Carolina judgment out of property belonging to Johnston in that state. They made diligent efforts to locate property belonging to Johnston in the District of Columbia, where he resided. During the period from 1911, a date prior to the rendition of the South Carolina judgment, to the date of the sale of the property in 1917, the stock of the East Lake Lumber Company was deposited with an escrow agreement for the sale of the land with a trust company in the city of Baltimore.

It is urged that the creditors might have brought an action requiring Gittings, as alleged trustee, to disclose the property he held as such; but they had not only been advised by Gittings that Johnston was insolvent, but that he had disposed of all his stock and interest in the East Lake Lumber Company, excepting a small number of shares of stock, which had been hypothecated at full value for a loan with a Baltimore trust company. It was not until after the sale of the proper-

ty in 1917 that the judgment creditors became .aware of the trustee-ship and the disposition Johnston had made of his stock, or were able to discover the true relations existing between Johnston and Gittings. It was then with reasonable promptness that the creditors' bill for the appointment of an administrator was filed, and followed by the administrator in bringing the present action.

[5] Nor is the contention that there may be a remedy at law in the present case important. While it is a rule that courts of equity, in cases of concurrent jurisdiction, consider themselves bound by statutes of limitation governing actions at law, fraud creates an exception to the rule, unless a defense is available, founded upon the lapse of time and the staleness of the claim. Godden v. Kimmell, 99 U. S. 201, 25 L. Ed. 431; Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718.

[6] When, as in the present case, fraud grows out of a conspiracy to defraud creditors between the parties to a secret trust, mere lapse of time, in the absence of failure to act upon notice of the fraud, is of little concern. There is no invasion here of any fixed rule governing the doctrine of laches. In the McIntire Case the court said:

"We have no desire to qualify in any way the long line of cases in this court, too numerous even for citation, in which we have held that where the fraud is constructive, or is proved by inconclusive testimony, or by evidence falling short of conviction, and the property has greatly increased in value, great diligence will be required in the assertion of the plaintiff's rights. But these were all cases either of bills to establish a trust, to open settled accounts, bills not involving fraud, or where the fraud was not clearly proven, or where, with knowledge of the facts, the fraud had been deliberately acquiesced in, bills to impeach judicial proceedings, or where the property had passed into the hands of persons innocent of the fraud, or with no actual notice that a fraud had been committed."

The present case comes within none of the exceptions above enumerated. Here the fraud is actual, not constructive; there is no evidence of acquiescence in the fraud, or that the property has increased in value, or that the property sought to be recovered is in the hands of persons innocent of the fraud. In Prevost v. Gratz, 6 Wheat. 481, 497 (5 L. Ed. 311) the rule was announced by Mr. Justice Story as follows:

"It is certainly true that length of time is no bar to a trust clearly established; and in a case where fraud is imputed and proved, length of time ought not, upon principles of eternal justice, to be admitted to repel relief. On the contrary, it would seem that the length of time during which the fraud has been successfully concealed and practised is rather an aggravation of the offense, and calls more loudly upon a court of equity to grant ample and decisive relief."

It cannot be claimed in the present case that any one has been injured by the delay in bringing the present action. Defendants Gittings and Johnston were not prejudiced by the delay, inasmuch as they were given time to dispose of the land and realize a price thereon satisfactory to themselves. Assets were created more satisfactory to them than doubtless would have been the case, had the stock of the East Lake Lumber Company been seized, and the property sacrificed under a forced sale. At the time the present suit was brought, the sale had

been made, and the proceeds thereof had gone into the hands of Gittings and Johnston, at a time well within the period of the statute of limitations; and inasmuch as we have held that no legal trust was created, setting aside this property for the benefit of the widow, children, and sisters of Johnston, the question of damage by delay is limited solely to Johnston and Gittings.

[7] Where no damage is shown to have occurred, courts of equity will be much more lenient in sustaining a right of action as against the plea of laches than where it appears that through delay irreparable damage has been sustained. As this court said in George v. Ford, 36 App. D. C. 315, 333:

"So great is its abhorrence of fraud and the violation of fiduciary obligations, that a court of equity will look with some indulgence upon mere delay, from which no material injury has occurred."

It may well be, as urged by counsel for defendants, that Edwards, Thackston, and Haynesworth are estoppel by the Carolina judgments to assert any interest in the stock of the East Lake Lumber Company; but that is not this case. This is an action by an administrator to recover property belonging to his decedent's estate to satisfy the claims of creditors, and to distribute any balance among the legal heirs of the deceased. We are concerned here only with the fundamental issue whether or not the conduct of Gittings in respect of the property belonging to plaintiff's decedent can be sustained, or was it so tainted with fraud as to require a court of equity to compel the return of the property to the corpus of the estate. There is no attempt to assert an interest in the stock of the East Lake Lumber Company by any one, but merely to bring into the hands of the administrator, in kind or through an accounting, the moneys, property, and stock, of whatever kind or description, belonging to Johnston which came into the possession of Gittings under his alleged trusteeship.

The decree is reversed, with costs, and the cause is remanded, with directions to the court below that a decree be entered declaring the trust agreement void and of no legal effect against the creditors of the estate of Rozelle E. Johnston, deceased, and have a general accounting under the direction of the court as prayed for in the bill.

This case was decided prior to the death of the late Chief Justice.

SMYTH, Chief Justice, dissenting.

### On Petition for Rehearing.

PER CURIAM. A petition for rehearing, filed herein, calls attention to an alleged oversight on the part of the court in respect of certain indefinite testimony given by the party Thrackston, to the effect that prior to the South Carolina judgment, information came to him through Gittings that Johnston had "transferred a very large portion of his assets to Mr. Gittings as trustee." This may be regarded as of little importance, since there is nothing to show that Thackston imparted the information to his associates, and it was followed, not only by the statements of Gittings, but by his sworn testimony in the Bor-

299 F.—44

der State Lumber Company Case, to the effect that Johnston had dissipated the stock of the East Lake Lumber Company and was insolvent.

Finding nothing to change our conclusion, the petition for rehearing is accordingly denied, with stay of mandate until the further order of this court.