## DAHLGREN v. DAHLGREN et al.*

(Court of Appeals of the District of Columbia. Submitted December 7, 1923. Reargued March 3, 1924. Decided October 6, 1924.)

No. 3983.

**1. Trusts ⊕═95 — Property held fraudulently acquired by mortgagee at foreclosure sale and impressed with trust.**

Where mortgagee purchased property at foreclosure sale without informing mortgagor of foreclosure proceedings, notwithstanding continuous correspondence between them, the property became impressed with a constructive trust in favor of mortgagor.

**2. Trusts ⊕═103(2) — Attorney managing brother's affairs held trustee for brother, estopping him from acquiring brother's land.**

An attorney, who was managing his brother's business affairs and had the absolute confidence of his brother, was brother's trustee, and was estopped from speculating in or acquiring absolute title to any of the brother's property held by him.

**3. Trusts ⊕═92½—Equitable trust is outside of statute.**

An equitable trust is outside of the statute of frauds, and may exist notwithstanding its restrictions.

**4. Trusts ⊕═171—Trustee cannot, without beneficial owner's consent, fix trust on property.**

Trustee cannot, without consent of beneficial owner, fix trust on the property in favor of other beneficiaries.

**5. Trusts ⊕═17, 18(7)—Agreement to create express trust must be in writing.**

Under Code D. C. § 1118, agreement between trustee and beneficial owner, authorizing trustee to sell lands, discharge liens, and hold balance of proceeds for benefit of owner's children, must be in writing.

**6. Trusts ⊕═21(1), 63¾—Express or implied trust must be such as to enable court to decree its administration.**

An express or implied trust must possess inherently the legal specifications which will enable a court to decree administration in accordance with the wishes of the settlor, who alone has power to assent to it and decree it.

**7. Trusts ⊕═21(2) — Agreement authorizing trustee to sell property and use proceeds for benefit of beneficial owner's children held too uncertain for administration.**

Agreement entitling trustee to sell property, pay incumbrances, and devote corpus for benefit of beneficial owner's children, without providing for amount children are to receive, termination of trust, and disposition of principal, or any residue remaining after objects of trust have been accomplished, *held* too uncertain for administration.

**8. Trusts ⊕═25(1)—Intention to create trust must be clear.**

While no precise form of words is necessary to create a trust, the intention must be clear.

Robb, Associate Justice, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Suit by Winthrop Dahlgren against John B. Dahlgren, for whom Luisa A. Dahlgren, administratrix of the estate of John B. Dahlgren, deceased, was substituted, and in which Etha A. Dahlgren and others intervened. From a judgment for interveners, plaintiff appeals. Reversed and remanded.

F. D. McKenney and J. S. Flannery, both of Washington, D. C., for appellant.

Wharton E. Lester, of Washington, D. C., for appellees.

Before ROBB and VAN ORSDEL, Associate Justices, and BARBER, Judge of the United States Court of Customs Appeals.

VAN ORSDEL, Associate Justice. Appellant, Winthrop Dahlgren, and appellee John B. Dahlgren, brothers, together with their sister, inherited a large estate from an aunt. They not only became beneficiaries under the will, but also under the provisions of certain deeds of trust executed by the aunt in her lifetime. Under these conveyances Winthrop became vested with one-third interest in certain real estate located in New York City, Washington, and elsewhere, which real estate was subsequently partitioned and apportioned by agreement between the three beneficiaries.

John B. Dahlgren was a lawyer and a trustee under the deeds of trust from the aunt; also one of the executors of her will. The will contained the following clause: "It is my earnest request that all my family to whom I have left property shall, before making any business arrangements, seek the advice and counsel of their brother, John B. Dahlgren." John managed and controlled the entire estate until October, 1913, when the partition and division of the property occurred.

Winthrop appears to have been a spendthrift, and, in a short time after acquiring the property, became heavily involved. By February 2, 1918, his brother John had loaned him $14,979, taking as part security deeds of trust on Winthrop's Washington real estate. Prior to 1917 Winthrop had given a deed of trust of all his real estate to the Real Estate Title Insurance & Trust Company of Philadelphia to secure the payment of $55,000. This trust was prior to the ones held by John on the Washington real estate.

In 1917 the trust company instituted foreclosure proceedings, which were met by the defense of usury. There were numerous judgments and claims against Winthrop, some of which were liens against the Washington real estate. His condition had become such that he was in arrears of alimony, which had been awarded his divorced wife, with contempt proceedings pending.

*Certiorari denied 45 S. Ct. 125, 69 L. Ed. ——.

His children were in the care of the Children's Society, having been taken from the custody of the mother, to whom they were given by decree of divorce. Through all of these years, however, the most friendly and confidential relations had existed between the two brothers, and Winthrop, in his financial and domestic troubles, had consulted with and apparently relied upon the judgment of his brother John.

On September 28, 1917, John wrote Winthrop, advising a settlement of the foreclosure suit by surrendering to the trust company the New York property, and securing a release of the Washington property from the prior lien of $55,000. In this letter John said in part: "Therefore, under the circumstances, I came hurriedly to the conclusion that it was best that, we compromise the matter on their terms, which will give me the opportunity to make up the loss on the Washington property. * * * We must stick together in the trust company matter, and I shall insist upon the free handling of the Washington end. I feel confident that I can more than make it up to you with the Washington property, even after payment of indebtedness to Sugarman, Lester, and the moneys due me. I will come to New York whenever I am needed, and when it comes to a settlement with Silverman I shall insist upon being present, and outlining just what we will do."

Silverman was a New York lawyer representing Winthrop's divorced wife in her action for alimony and maintenance and support of the children. Sugarman was also a lawyer, who had represented Winthrop in numerous matters connected with his affairs in New York.

A settlement was made with the trust company, negotiated largely by John, whereby it was agreed that, as soon as the foreclosure proceedings were concluded on the New York property, a full release was to be given by the trust company of all claims against the Washington real estate. This release was prepared by John and forwarded to New York for execution. Following this in October, 1917, John instituted foreclosure proceedings against the Washington property. The property was advertised by the trustee for sale under the deeds of trust held by John, subject to the prior trust of $55,000, alleged to be held by the Philadelphia trust company. The sale occurred eight days after publication of the notice, and the property was bid in by John for $4,400. Subsequently the release of the Washington property was executed by the trust company and placed on record by John.

The record discloses continuous correspondence between the brothers relative to their affairs, both before and after the foreclosure proceedings, in none of which John made any reference to the sale of the Washington property. Finally, in June, 1918, about nine months after the foreclosure of the trust against the Washington property, John wrote Winthrop, stating: "I foreclosed on this property, and it is mine to do as I see fit with; but, if I choose to help you in the matter of the children and Maud, it's nobody's business but mine."

John also notified Sugarman in August, 1918, as follows: "Winshrop's Washington property was sold under the two trusts held by me, and bought in by me at a less value than the face of said trusts, and therefore is my property, and as there never was an agreement between us, as you state in your letter, I most emphatically will not consider your proposition. I told Winthrop that I would help him in settling his domestic troubles, and I am doing it, although without any legal obligation on my part. I also told you that, if any excess belonging to Winthrop over and above what he owed me came into my hands, I would safeguard your interest as per your agreement with him, which was 25 per cent., if my recollection serves me correctly. There is no such excess, nor do I know where any can come from; therefore, as far as I am concerned, the incident is closed."

Coming to the present suit, which was brought by Winthrop against John, individually, the relations heretofore detailed as existing between Winthrop and John are set out in the bill. It is averred that the sale of the Washington property under the trusts held by John occurred without the knowledge of Winthrop, and that he was not advised of the sale until June, 1918; that the property sold was of the value of $90,000, and was bid in by John for $4,400; that the advertisement of the property for sale subject to the $55,000 trust held by the Philadelphia trust company, after a release of the trust had been agreed upon and negotiated in part by John himself, constituted a fraud, which was made the basis of the prayer to set aside the deed executed by the trustee to John, and that the sale be decreed null and void and held for naught. It is further averred that after the sale John leased a portion of this property to the United States government, and sold a portion of it for a large sum of money, the

amount of which was more than sufficient to satisfy all claims outstanding against Winthrop, as well as all claims for money advanced by John. The plaintiff asked that a receiver be appointed to collect the rents for property leased and for money due or payable for property sold, and that John be required to discover to the plaintiff all moneys received from rents or benefits of said real estate, or from the sale or transfer of any portion thereof, and to account for the same.

Defendant answered, denying the charge of fraud, and denying "that the object of said sale was to obtain said property for his own use and benefit, except so far as was necessary for the protection of the money then due him by the plaintiff, and as security for such further advances as he should subsequently make in connection with said property or to the plaintiff, or for the benefit of plaintiff's family as hereinafter, together with lawful interest. He avers that he has not at the present time, and has never had, any desire, intention, or expectation of receiving any profit from said property for his own use, but has always intended that he should be repaid such amounts as might be lawfully due him, together with lawful interest thereon. * * * That he required and demanded that the release of the trust therein mentioned be executed and delivered to him, because of the fact that he was at that time the owner of the legal title to said real estate [the Washington property], all of which was well known to plaintiff, and was with his full knowledge and consent."

Defendant denied that, at the time he foreclosed on the Washington property, the trust company had agreed to release the New York property, "but admits that negotiations were pending for such release, that he had knowledge thereof, and that both he and the plaintiff then believed the said property in Washington would be released from the effect and operation of said deeds of trust and of said suit in New York."

Defendant then sets out at length the financial condition in which plaintiff was involved, and avers that he undertook to devise a solution of the difficulties; that an agreement was made between plaintiff and defendant under which defendant was to handle the Washington property with a view to the payment of the claims against it, his own as well as others, and for money to be advanced in effecting a settlement between plaintiff and his wife, and for the support of plaintiff's children. Defendant further

avers that to accomplish this it would be necessary for him to own and control the property by purchase or otherwise, and sell it when a fair market price could be obtained; that, after the liens and charges against it had been satisfied, he would hold the balance of the property or the proceeds of the sale thereof for the benefit of plaintiff's children; and that plaintiff, in view of the complications in New York, agreed to relinquish all interest in the property, and leave the whole matter to defendant's discretion. Defendant then prayed, as affirmative relief, that the balance of the property in his hands, after payment of all obligations, be placed by the court with some person or corporation as trustee for the use and benefit of plaintiff's minor children.

Pending the suit, by arrangement between counsel, certain of the premises were sold and all the claims against the plaintiff were satisfied and discharged; so that the sole issue to be determined was whether the property remaining belonged to Winthrop, or was impressed with a trust for the benefit of his children. At the conclusion of the trial, the court below entered a decree, the material part of which is as follows: "That the real estate described in said original bill of complaint, and the proceeds of the sales of such of said real estate as has been already sold under decrees herein, be and the same are hereby held to be impressed with a trust in favor of the intervening petitioners herein, namely, Etha Dahlgren, Keenan Dahlgren, and Winthrop Dahlgren, Jr., minor children of Maud Dahlgren and the said Winthrop Dahlgren, and shall be held by the National Savings & Trust Company of the District of Columbia for the sole use and benefit of said children free from any and all claims of any of the other parties hereto."

From this decree plaintiff appealed.

[1, 2] Fraud, as charged in the bill, we think, if standing alone, has been conclusively established by the evidence. If no higher relation existed between the parties than mortgagor and mortgagee, the deception practiced in the foreclosure proceedings would nullify the sale and impress upon the property, in the hands of John, a constructive trust in favor of Winthrop. It is, however, unnecessary to further consider this charge, since defendant in his answer abandoned his former claim that through the foreclosure of the trusts he acquired absolute ownership of the property in question. His present claim is reduced to the legal title. Overlooking fraud, and conceding this,

the legal title was held for the benefit of Winthrop, the beneficial owner. John was Winthrop's trusted adviser. He negotiated the compromise with the trust company, assuring his brother that the compromise would give him "the opportunity to make up the loss on the Washington property," and "that I can more than make it up to you with the Washington property" after paying all indebtedness. He further insisted upon "the free handling of the Washington end." The record overwhelmingly establishes that Winthrop turned over to him the whole matter of closing up his affairs. If this, with the voluminous correspondence set out in the record, is not sufficient to create an express trust, the proof showing the business relationship, the absolute confidence reposed in John by Winthrop, and the facts and circumstances admitted in the answer, made John a trustee for Winthrop, at a time prior to the foreclosure of the trusts, for the purpose of handling and closing up his affairs. John was therefore, by virtue of his fiduciary relation, estopped from speculating in or acquiring absolute title to any part of the property he held in trust.

[3] It follows therefore that, even in the absence of either an express or implied agreement that John should act as trustee for Winthrop, an equitable trust grew out of the fiduciary relation arising from the inherent nature of the transactions themselves, which is outside of the statute of frauds, and may exist notwithstanding its restrictions. "There is another class of trusts *which result in law* from the acts of parties, whether they intended to create a trust or not, and they are aptly designated as resulting trusts. They are sometimes called presumptive trusts, because the law presumes them to be intended by the parties from the nature and character of their transactions with each other, although the general foundation of this kind of trusts is the natural equity that arises when parties do certain things. * * * The statute of frauds does not affect the creation of these trusts, for the reason that, where there is no evidence of intention, it could not be expected that a declaration of intention in writing, properly signed, would be made or could be produced." Perry on Trusts and Trustees (6th Ed.) § 124.

[4] Nor can defendant satisfy the statute of frauds by attempting to convert certain averments of his answers in this and other cases into a declaration of trust in favor of plaintiff's children. John, being a mere trustee, was powerless, without the consent of Winthrop, to fix a trust upon the property in question. Chiswell, Adm'r, v. Johnston et al., —— App. D. C. ——, 299 F. 681 (present term). Winthrop, the beneficial owner, alone could establish a trust, and this must appear in writing with *"absolute certainty as to its nature and terms,* before the court can undertake to execute it." McCartney v. Fletcher, 11 App. D. C. 1, 19.

[5] What defendant relies upon in his answer, to avoid the charge of fraud, and to establish a trust in favor of the children, is not a resulting trust, which, under certain circumstances, may be established by parol evidence, but an alleged agreement between plaintiff and defendant, under which, as defendant avers in his answer, he "would try to evolve some arrangement whereby the Washington property could be saved for the benefit of his (the plaintiff's) children; * * * that, if he acquired it, he would hold it subject to what was then due him, and such amounts as he might thereafter advance for the plaintiff, or to him, or in connection with said property, with interest; and that he would sell it when in his opinion a fair market could be had, and that, after he and the liens and charges against said property had been satisfied, he would hold the balance of said property or the proceeds of such sale thereof, for the benefit of the plaintiff's children." But this is the averment of an agreement to create an express trust, a statement of the previous intention of the parties, which could only be "manifested and proved by some writing signed by the party who is by law enabled to declare such trust or by his last will in writing, or else they shall be utterly void and of none effect." Code D. C. § 1118.

[6, 7] But would such an indefinite agreement, if reduced to writing, be capable of enforcement as a trust? An express or implied trust must possess inherently the legal specifications which will enable a court to decree its administration in accordance with the wishes of the settlor, who alone has power to assent to it and to declare it. What estate is here granted for the benefit of the children, the income for a period of years, or the corpus of the estate? If the income, what is to become of the principal? If the income and a portion of the principal, what is to become of the residue? When does the trust terminate? Does it last for the life of the children, or only to maintain and educate them until they are self-supporting? The record fails to disclose any terms whatsoever. These are matters that cannot be supplied by a court of equity, but must ex-

pressly appear in the declaration of trust itself.

[8] While no precise form of words is necessary to create a trust, the intention must be clear. "The fact that a trust in lands is created must be not only manifested and proved by a writing properly executed, but must also be manifested and proved by such a writing what the trust is. The declaration of trust, whether written or oral, must be reasonably certain in its material terms, and this requisite of certainty includes the subject-matter or property embraced within the trust, the beneficiaries or persons in whose behalf it is created, the nature and quantity of interest which they are to have, and the manner in which the trust is to be performed. If the language is so vague, general, or equivocal that any of these necessary elements of the trust are left in real uncertainty, then the trust must fail. No particular technical words need be used; even the words 'trust' or 'trustee' are not essential; any other words which unequivocally show an intention that the legal estate was vested in one person, but to be held in some manner, or for some purpose on behalf of another, if certain as to all other requisites, are sufficient." 2 Pomeroy Eq. Juris. § 1009.

It is clearly apparent that the alleged agreement, set out in the answer, falls far short of meeting the requirements. No disposition whatever is made as to the amount that the children shall receive, the time the trust shall run, what shall be done with the principal, or any residue remaining after the objects of the trust have been accomplished. On its face it possesses none of the attributes of certainty essential to its validity.

Defendant died intestate after his sworn answer was filed, but before trial. No attempt was made at the trial to prove the alleged agreement, set up for the first time in the answer, by any writing; but it was attempted to prove it by the parol evidence of two witnesses as to conversations had with plaintiff, wherein he is alleged to have stated that defendant was to sell the Washington property, pay the obligations against it, and hold the balance in trust for his children. These declarations were alleged by the witnesses to have been made to them long subsequent to the foreclosure of the Washington property by defendant. The conversations were denied by plaintiff. It is clear that an express trust cannot be established in this way. The testimony of these witnesses amounted to nothing more than an indirect impeachment of plaintiff's testimony that the foreclosure of the Washington property was made without his knowledge or consent.

The decree is reversed, with costs, and the cause is remanded for further proceedings, not inconsistent with this opinion.

ROBB, Associate Justice (dissenting). This unfortunate proceeding involves two brothers, John B. and Winthrop Dahlgren. John, who died prior to the hearing below, was a member in good standing of the bar of this court and a man of integrity and character. Apparently he possessed the respect and confidence of all who knew him. Winthrop, on the other hand, as the majority opinion points out, was a spendthrift. More than that, he was a gambler and idler, lacking in moral sense, and oblivious to his family and other obligations. Within the space of a few years he had received and squandered more than $80,000, which had come to him through the death of a relative. At the time of the transaction giving rise to this suit, his wife had been compelled to divorce him, his children were destitute, he was in arrears of alimony, his creditors were pressing him, and proceedings were under way which would have absorbed whatever equity he might have had in the New York and Washington properties.

John Dahlgren knew all this, and no one appreciated better than he the futility of making further advances to Winthrop. The liens and claims against the Washington property fully equaled or exceeded its then value. John foreclosed under his deeds of trust and obtained legal title to this property. Owing to the war, he subsequently was able to sell it for considerably more than its value at the time of the foreclosure. After the foreclosure proceedings, John advanced money for the care and education of Winthrop's children. However, without any effort having been made to ascertain whether he claimed this property as his own, this bill was filed, charging him with fraud. In his answer he set forth the facts, and averred that he held title to this property in trust for the children of his brother Winthrop.

At the trial, the charge of fraud was entirely abandoned; counsel for Winthrop stating: "We have not relied on fraud since we started. * * * When he [John] admitted the averments of the bill, and denied that he held this property for his own use and benefit, then there was no longer any issue respecting fraud." Two

disinterested witnesses testified as to statements made by Winthrop concerning the arrangement under which John was to take title to this property. One of them, Mr. Silverman, a lawyer who represented Mrs. Dahlgren in her divorce proceeding, testified that he discussed the question with Winthrop on several occasions; that in the winter of 1918, at the time the settlement of alimony with Mrs. Dahlgren was made, Winthrop told him "that he had turned his property over to his brother, or his brother was to buy it in at some sale, I believe at a foreclosure sale, and he was to hold it, first, to secure himself against this indebtedness, and, secondly, to hold the remainder for the benefit and in trust for the children."

The other witness, Mr. Ford, a real estate broker, testified as follows: "Q. Did he say anything as to whether or not he agreed with John that John should hold this property in trust for his, Winthrop's, children? A. He [Winthrop] said John proposed it and he consented to it. Q. Why did he say he consented? A. To guard against any possible deficiency judgment that might be rendered against him in connection with the New York foreclosure. If there was a deficiency there, they would go for the Washington property, and John suggested that he hold it in trust and for the benefit of the children; and to prevent any deficiency judgment being placed against him in Washington, and also to secure the loan of $20,000. * * * "

At the close of all the evidence, the court in its findings said: "I find that Winthrop did know about this thing [the foreclosure], and on the evidence in the case I find, as a matter of fact, that he did intend that this property should be taken in trust for his children, and that would fit into the probabilities, moreover, much better than the other theory, because, why should John Dahlgren have taken all the trouble that he took in this matter about this property, unless he did it to join in a scheme to defraud Winthrop Dahlgren's creditors? Why should he do it for the benefit of Winthrop Dahlgren, only that the proceeds of the property, as said here, might be run through a rat hole, or it might be supposed he held some sieve without holes in it that could be filled up by it? * * * I am only con-

cerned with the settlement that was made. All that you are saying now is a matter that might be argued between the lawyer for Winthrop Dahlgren and the lawyer for Mrs. Dahlgren. They could have made those claims then; but I find, as a matter of fact, that when they did make the settlement it was made on the basis that Winthrop Dahlgren's children were taken care of in only one way, and that was by the obligation which John Dahlgren said he was under to them to take care of this property."

In my view, the evidence overwhelmingly sustains the findings of the learned Chief Justice below, and, if those findings are accepted, the conclusions reached by him follow as of course. Winthrop Dahlgren was indebted to his brother John, and that indebtedness was secured by valid deeds of trust, which John had a legal right to foreclose. Having given Winthrop notice, as he undoubtedly did, of his intended action, Winthrop had no cause to complain because John, instead of insisting upon his legal rights, voluntarily charged himself wth anything he thereafter might make out of the property, for the benefit of his brother's children. Knowing as he did that Winthrop would not take care of his own children, it was the natural and praiseworthy thing for John to do, as the court below finds; and yet John's conduct now is characterized as fraudulent, and this fund which he tried to preserve for the benefit of these helpless children is to be turned over to their unworthy father.

There is another view that may be taken of this case: If Winthrop Dahlgren's present contention is correct, namely, if he had a secret understanding with John, whereby John, while taking the legal title to this property, was to hold it in trust for Winthrop, the arrangement clearly was made, on Winthrop's part, at least, to hinder, delay, and defraud his creditors. It is submitted, therefore, that, accepting his own statements as true, the doors of a court of equity should be closed to Winthrop Dahlgren.

Believing, as I do, that the findings of fact of the trial court have not been given due weight, and that the principles of equity have been violated in the conclusion reached here, I respectfully dissent.