## MERRITT, CHAPMAN & SCOTT CORPORATION v. TEXAS CO. et al.

## TEXAS CO. v. ARUNDEL CORPORATION et al.

### No. 374.

Circuit Court of Appeals, Second Circuit. July 18, 1938.

Foley & Martin, of New York City (James A. Martin and Christopher E. Heckman, both of New York City, of counsel), for Arundel Corporation.

Lynch & Hagen, of New York City (Charles W. Hagen and Henry C. Eidenbach, both of New York City, of counsel), for Texas Co.

Haight, Griffin, Deming & Gardner, of New York City (Henry M. Hewitt and James McKown, Jr., both of New York City, of counsel), for Merritt, Chapman & Scott Corporation.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This appeal is from a decree in the admiralty holding jointly liable the motorship, "Newark", and the tug, "Furst", for a collision in the Kill van Kull on the night of May 29, 1936. Only the Arundel Co., owner of the "Furst", has appealed, but as the Texas Co., owner of the "Newark", has filed cross assignments, it too is in the position of appellant. The judge held both boats at fault and divided the damages. The facts were as follows. A dredge was at work in the Kill van Kull, facing east along the thread of the stream, about 340' from the New Jersey pier ends and 700' from the Staten Island shore. Forward on her starboard or southern side a loaded dump scow had been made fast, which those on board dropped back until she hung by a line from her middle stern bitt to the dredge's starboard stern corner, tailing somewhat towards the Jersey shore. The tug, "Furst", brought a light scow to the dredge which she put in the place of the loaded one and then backed away: as she did so, her stern went off to the southward and she turned to port. After she had got west of the end of the loaded scow, she came forward on a left rudder, until her nose touched or nearly touched the scow's stern, and she was then headed at a substantial angle to the thread of the stream. All these vessels carried the regulation lights, but the angle of the "Furst" to the thread of the stream was not enough to open her red light to a vessel bound east. While this had been going on, the "Chapman Brothers", the libellant's lighter, was towing the sludge barge, "Brooklyn", easterly through the Kill, lashed to her port side, on a course half way between the dredge and the Staten Island shore. Both barge and lighter were showing the regulation lights. At the same time the motorship, "Newark", was bound east in the Kill: she had been going along in about the center of the stream until she was about 1800' from the dredge, when she put her rudder left and then straightened out; in that position she could have passed safely between the dredge and the Jersey shore. When between five and six hundred feet away from the "Furst" she blew a two blast signal, fearing that the "Furst" might cross her course. The "Furst", thinking that the "Newark" had not seen the loaded barge, and that she meant to pass between the dredge and herself, blew the danger signal. This so upset the master of the "Newark" that he put his helm hard right, and swung into the "Brooklyn" which he had been overtaking all the while. The foregoing statement of facts is taken from the findings of the court which we accept. The judge held the "Furst" at fault for backing from a place of safety across the course of the "Chapman Brothers"; for failing to sound a backing signal; for failing to hear a one blast signal blown her by the "Chapman Brothers"; for misunderstanding the proposed course of the "Newark"; and for blowing the danger signal. He found the "Newark" at fault for failing to keep clear of the "Brooklyn" which she was overtaking; and for going at full speed while approaching the dredge.

All but one of the "Furst's" supposed faults had nothing to do with the collision. The fact that she failed to blow a backing signal was not material; she had already stopped backing, had come forward and was at rest, when the "Newark" saw her, and she did not back thereafter: her failure could be a fault, qua the "Newark", only in case she had backed into her path without notice. She should not in any event have answered the one

blast signal of the "Chapman Brothers", because she was not on a steady course, but even if she had done so she would merely have advised that vessel: her signal would have had no effect upon the "Newark's" conduct, and she owed the "Newark" no duty. Her only possible fault which had a relation to the collision was the danger signal. That she blew because she mistakenly supposed that the "Newark" meant to go between her and the dredge. (Even so the judge found that the "Newark" showed her both her running lights, a situation which, one would suppose, justified some anxiety). This provoked the "Newark" to the wholly unexpected and unjustified swing into collision with the "Brooklyn" which she had been overhauling, and out of whose way she was therefore bound to keep. The judge held her at fault for this, and no other result was possible, though the findings are somewhat contradictory. The 17th declares that, had she kept on her "projected course, she would have passed safely between the dredge and the Jersey shore"; the 24th, that at the time of the danger signal "the only steps which the 'Newark' could take to avoid collision with the 'Furst' were to put the engines full astern and throw the rudder hard right". Obviously both these cannot be true, unless they speak of different moments between which the "Newark" had edged in towards her right. A course which would carry her safely between the dredge and the Jersey shore, could not have brought her into collision with the "Furst", which was either wholly to the south of the dredge, or at least was never north of it. However, it is not necessary to resolve the contradiction, because on either theory the "Newark" was at fault: if she could have passed clear, she swung into the "Brooklyn" without any excuse; if she was so close to the "Furst", that she could only avoid her by a hard over helm, she had failed in her lookout, either as to the "Furst", or to the "Brooklyn", for all the vessels were properly lighted and the night was clear. There is an additional ground for saying that she kept a bad lookout: she supposed that the "Furst" was across her course and to the north of the dredge, and that she was tailing towards the Jersey shore.

The only debatable point is whether the "Furst's" danger signal was a fault, and how far it excused the "Newark". As we have already said, if the "Furst", at rest, saw the "Newark's" two running lights apparently bearing down upon her, it would be a harsh doctrine that she was not justified in uttering a cry of warning; but we do not wish to put our decision on that, because, while we should not care to commit ourselves to the doctrine that it can never be a fault to blow a danger signal, we are at a loss to think of an occasion when it would be. The books do not contain a whisper that it ever is; and here at any rate it certainly was not. It is quite true that literally Inland Rules, art. 18, Rule 3 (section 203, title 33, U.S.Code, 33 U.S.C.A. § 203), does not call for a "danger signal" at all; it directs a master to blow only when he "fails to understand the course or intention of the other", and a purist might argue that it did not cover a case where he knew well enough that "course or intention", but wished to say that he thought it dangerous. But it has been universally interpreted as applying to cases where the master believes that safety requires a change of navigation, and by far the greater number of occasions of its use are just of that sort. We upheld this construction in The San Simeon, 2 Cir., 63 F.2d 798, 801, and repeat that ruling now. Moreover, Rule 1 of the Pilot Rules calls it a "danger signal", and Rule 26 of the Great Lakes Rules (section 291, title 33, U.S.Code, 33 U.S.C.A. § 291) directs it as an answer to any signal which a master "deems * * * unsafe".

While it does not inevitably follow that it is not a fault to sound it when there really is no danger, it is to be observed that the rule sets up no objective standard; it commands the master to blow when he does not understand, or —with the scholium added which we have just discussed—when he "deems * * unsafe" the apparent purpose of the other vessel. Doubts or fears are its occasion; not reasonable doubts or fears. Moreover, it is clear that any other interpretation of the rule would destroy its usefulness. While the signal does suggest a change of navigation, it imposes no duty of compliance on the other vessel; it is only a suggestion; and it does not even suggest any definite change, leaving that to the other master, if he agrees. Its only importance lies in the judgment of the master that the situation is dangerous; that judgment is upon facts patent to both, on which each is charged to act

722

as the rules and his seamanship dictate. True, there can be no value in a judgment without basis in fact, but it would prevent all free expression and frustrate the whole purpose of the rule to condemn as a fault a spontaneous estimate at the moment because it turned out later to be wrong. This might be necessary if the signal demanded action, but, being no more than a recommendation, the master who hears must use some critical faculty of his own. If he is so sensitive to the opinions of others that he cannot resist them, he is not fit to command.

Decree modified by holding only the "Newark" at fault.