STANDARD OIL COMPANY OF CALI-
FORNIA, a Delaware corporation,
Libelant,

v.

CALMAR STEAMSHIP CORPORATION,
a Delaware corporation, Schafer Bros.
Logging Company, a Washington cor-
poration, and R. J. Ultican Tug Boat
Company, a Washington corporation,
Respondents.

No. 7670.

United States District Court
W. D. Washington, S. D.

Dec. 31, 1954.

Helsell, Paul, Fetterman, Todd & Hokanson, Seattle, Wash., for libelant.

Bogle, Bogle & Gates, Seattle, Wash., for respondent Calmar Steamship Corp.

Evans, McLaren, Lane, Powell & Beeks, Seattle, Wash., for Schafer Bros. Logging Co.

Summers, Bucey & Howard, Seattle, Wash., for R. J. Ultican Tug Boat Co.

BOLDT, District Judge.

On July 24, 1953 at approximately 3:-35 p. m. the Liberty ship Portmar was proceeding up the Chehalis River under assisting tow by the tug Tussler. The Portmar was bound for a point some distance upstream from a bend in the river known as "Standard Oil Bend" because of a dock of that company located on the north bank of the river near the apex of the bend. At the same time the tug Schafer was towing a large raft of logs downstream bound for a destination below the same bend. On meeting and passing at the river bend the log raft swung out of trailing position behind the Schafer and collided with the Portmar a short distance aft of its bow. After such collision the Portmar collided bow on with the Standard Oil dock. Libelant seeks recovery for the damages to the dock from the Portmar and both tugs. Each of the respondents asserts that fault of one or more of the other respondents was the sole proximate cause of the damage complained of.

Two general issues of fact must first be determined as a starting point for decision of the case and as a basis for considering all of the other questions involved. These have to do, first, with signals and, secondly, with the position of the vessels at the time of sighting each other, particularly as related to their distance and direction from the Standard Oil dock at the river bend in question.

I find that the Schafer did not signal for the bend or at any other pertinent time and that this was a violation of Rule V of the rules applicable to her navigation at the time. Inland Rules of the Road, 33 U.S.C.A. § 203. I find that the Portmar did signal as required by the rules both for the railroad bridge a short distance downstream from the Standard Oil dock bend and for the bend itself. Every witness who testified that he did not hear the bend signal was shown by the evidence to have been engaged at that time in one activity or another causing his attention to be directed toward other matters in such a manner that his testimony on the bend signal is negative only and of little or no probative value when contrasted to the direct, positive and unequivocal testimony of several credible and unimpeached witnesses. Socony-Vacuum Oil Co. v. Smith, 5 Cir., 1950, (Sachen-George A. Butler and Tow) 179 F.2d 672, 675, 1950 A.M.C. 445, 449; Woodruff v. Pitney, D.C.E.D. N.Y.1942, 47 F.Supp. 797, 1942 A.M.C. 1268.

No one aboard the Schafer testified to hearing the bend signal although the captain of the Schafer admitted that bridge signals could be, and on several occasions had been, heard by him when his vessel was in the area of the Schafer's position at the time of the Portmar bend signal. Bridge signals would be given at a much greater distance under otherwise identical conditions. From these circumstances I find that the captain of the Schafer could and should have heard the Portmar bend signal and that

his failure to hear it, or to heed it if hearing it, was a fault. The New York, 1899, 175 U.S. 187, 204, 20 S.Ct. 67, 44 L.Ed. 126, 134.

■ I find that the Portmar bend signal, properly sounded, was given within the half-mile distance required by Article 18, Rule V, and that this was a proper and safe place for the signal to be given. The Portmar is 425 feet long and the bend signal was given at a distance from the bend of approximately six lengths of the vessel. If the bend signal, by a vessel of that size, were given at any substantially less distance, a trier of fact might well find such signal a noncompliance with Article 18, Rule V, as indicated in Boyer v. The Merry Queen, 3 Cir., 1953, 202 F.2d 575, 1953 A.M.C. 482. When a vessel gives a proper bend signal as required by Article 18, Rule V, and receives no response, those navigating such vessel have the right to assume that the channel and bend are clear and may proceed in reliance upon the assumption that the vessel will be permitted to enter and pass through the bend without obstruction or interference by other craft required to heed and respond to the bend signal under the rule.

■ The undisputed testimony is that, at the time of first sighting, each of the vessels was well over on its port side of the stream, the Portmar and its tug Tussler near the north bank in the deep water channel, and the Schafer with its tow quite close to the south bank. It was perfectly clear to each of them that starboard-to-starboard passing was intended and under the situation as then existing there was no obligation on the Portmar to signal either as a statutory duty or as a nonstatutory duty. Inland Rules of the Road, Article 18, Rule I; Tucker v. The Socony No. 9, 2 Cir., 1948, 167 F.2d 685, 1948 A.M.C. 928. Whether or not the Schafer should have signaled intention to make a starboard-to-starboard passing is more doubtful in view of the fact that it had ignored the bend signal and was in statutory fault at that time. It does not seem necessary to determine this point because under the circumstances the giving or nongiving of signal for a starboard passing had no causal relationship to what occurred thereafter.

■■ As to danger signal, I am convinced that only the Schafer could be charged with fault in that respect. The Schafer captain and crew testified that they were strongly apprehensive that their raft in tow would swing out of control across the channel on approaching or reaching the river bend. With such apprehension the captain of the Schafer ought to have given the danger signal immediately after sighting the Portmar. In any event he ought to have given such signal at the moment that the raft in fact did start swinging across the river from its proper trailing position. I find that the Schafer was at fault in not giving the danger signal at any time after the Portmar was sighted, although it is very doubtful whether a danger signal by the Schafer would have averted the accident, particularly if delayed until the actual deviation of the raft from proper trailing position. The purpose of a danger signal is to apprise other craft of the imminence of danger. Merritt, Chapman & Scott Corp. v. Texas Co., (Frank A. Furst) 2 Cir., 1938, 98 F.2d 719, 721, 1938 A.M.C. 1064, 1067. The danger in the situation was fully known to the Schafer immediately on sighting the Portmar; accordingly, signal thereof by the Portmar could not have had any useful purpose. Moreover, the danger arising from the cross-stream swing of the raft—the cause of the subsequent collision—was not known or apparent to the Portmar pilot until some time after the vessels first sighted each other, at which time there was no point or purpose in a danger signal by the Portmar. I find that the omission of danger signal by the Portmar was not a fault and in any event had no causal relationship either to the collision of the raft with the Portmar or to the Portmar's collision with the Standard Oil dock.

It is not possible to determine with mathematical certainty the second general fact issue as to the relative positions of the Portmar, the Tussler, the Schafer and its tow at the time of sighting each other. At best, under the evidence, only an approximation can be made, keeping in mind that moments later the position of each vessel and the raft had changed materially. Apparently each of the vessels was sighted by the others as they approached the bend at the earliest time shore obstructions would permit sighting. A careful analysis of the evidence satisfies me that, at the time of sighting, both the Portmar and the Schafer were considerably further upstream than as testified by the captain and crew members of the Schafer. At the time of sighting, the Portmar was within a very short distance of a point opposite and south of the Standard Oil dock. I find such distance to have been approximately 750 feet southwest of the downstream corner of the Standard Oil dock.

All witnesses testifying as to the distance between the bow of the Portmar and the bow of the Schafer at the moment of sighting estimated the same at approximately 1,500 feet. While under the physical conditions such distance might have been greater, I find it to have been substantially as estimated by the eye witnesses, recognizing, however, that the figure is admittedly an approximation. Based on the two findings thus made, the approximate position of the Schafer at sighting time can readily be determined as being approximately 750 feet upstream from the downstream corner of the Standard Oil dock.

I further find that, at the time of sighting, the Portmar had proceeded so far in approaching the river bend that it was a matter of judgment rather than of fault on the part of those navigating the Portmar whether the Portmar should continue into the bend or attempt to stop or fall back. Under the evidence in this case I do not feel that the court can substitute its hindsight judgment for that of the pilot in a critical situation not created or contributed to by his fault when the time for consideration and action would have to be counted in seconds and when each of the alternatives available involved substantial hazard. The Favorita, 1873, 18 Wall. 598, 603, 21 L.Ed. 856, 859; The Stifinder, 2 Cir., 1921, 275 F. 271, 276.

Under such basic findings, we have two vessels, one under assisting tow and the other towing a large raft of logs, approaching each other and meeting at a dangerous river bend at a combined overground speed of 10 to 12 miles an hour, or at a minimum of 1,000 feet per minute. They were approaching at such a rate as to meet within a maximum of two minutes, in which time occurred all of the many changes in the situation following first sighting.

If we are to give any effect at all to the express wording of Rule V, a pilot who gives a proper bend signal and receives no response is entitled to proceed toward and into the bend on the assumption that it will be clear and that whatever craft may be approaching or within the bend will keep out of the way and permit the signaling vessel to negotiate the bend without interference. I find that the Portmar pilot had such right in this instance and that his navigation must be judged in that light. It is undisputed that when first sighted, and for at least a short time thereafter, the log raft was properly trailing directly behind the Schafer. The Schafer captain and his crewman both so testified. It is also undisputed that, at first sighting, the Schafer and its tow were well over on the southerly side of the river. If they had continued in such position there would have been no collision, or danger of collision, and there would have been no occasion for either the Portmar or the Schafer to take any action. Some time elapsed before those on the Portmar saw the raft being towed by the Schafer and determined its character, size and position; further time expired before the raft started swinging across the river; and more time passed during the

maneuvers of the Schafer designed to bring the raft back into trailing position on the south side of the river, which maneuvers were initiated as soon as the raft deviated from its proper trailing position; from which it is clear that the danger of the raft's colliding with the Portmar, or at least the certainty of it, was not apparent to the Portmar pilot until the vessels were very near each other and only seconds in time before such collision occurred. Under such circumstances I do not feel justified in charging the Portmar with fault in its actions or lack of action following first sighting.

Schafer's counsel contend that the Portmar was at fault in approaching the river bend, primarily in the matter of speed. The Court was very favorably impressed with the testimony of Captain Slover, the pilot of the Portmar, and with that of Captain Henderson, one of the most experienced Chehalis River pilots. Both of these highly reputable and credible witnesses testified that the navigation of the Portmar in approaching the river bend was proper and in accordance with good pilotage in every respect, including speed. The bellbook and log show that the speed of the Portmar was "slow ahead" and the evidence does not warrant a finding that such speed was excessive. One of the pilot witnesses produced by the Schafer testified that it was his practice to proceed along a portion of the river upstream from the bridge at half ahead speed until within a short distance of the river bend when he calls for a lesser speed. The Court is satisfied that the Portmar was not at fault in the manner or speed of its approach to the river bend up to the time of sighting the Schafer and finds such as the fact.

The findings thus far made establish that the Schafer, in statutory fault, met the Portmar, not previously at fault, at the river bend and shortly thereafter its raft in tow swung out of a proper trailing position across the river in such a manner as to create a situation involving danger of collision which the Portmar did not have reasonable time or opportunity to avoid. The evidence indicates that the log raft started swinging across the channel when the Schafer pulled to its port, and such maneuver may well have caused or contributed to causing the raft to deviate from proper trailing position. This in itself might be found a fault on the part of the Schafer under the authorities. The R. J. Moran (Tug J. C. Hartt-Scow 9–S), 2 Cir., 1924, 299 F. 500, 1924 A.M.C. 796, 798–9. Considering that for years the Schafer captain knew the river bend in question to be a dangerous place for meeting another vessel, a heavy burden rested on him to keep his tow under control and trailing properly.

Whether the situation confronting the pilot of the Portmar is appropriate for application of the *in extremis* rule, or whether the major-minor fault rule is applied, the conduct of a pilot, unexpectedly and without fault on his part placed in a position of peril requiring almost instantaneous choice of alternative actions involving hazard, is not to be scrutinized only in the light of hindsight, or as critically as navigation is scrutinized when the pilot has greater time for consideration and action and when nonhazardous alternatives are available. The Genesee Chief, 1851, 12 How. 443, 461, 53 U.S. 443, 461, 13 L.Ed. 1058, 1066; The Transfer No. 8, 2 Cir., 1899, 96 F. 253, 256. In this connection application of the last clear chance rule has been considered. As its wording indicates, such rule becomes applicable only when a reasonably *clear* chance to avoid collision is presented. The most that can be said of the evidence in the present case is that by complicated computations made at leisure we can speculate on actions that might have been taken, or on actions that might have been taken earlier, which might possibly have avoided casualty. I find that under the conditions and within the time available those navigating the Portmar did not have a reason-

ably clear last chance to avoid collision with the raft or the dock.

 Whether or not the Portmar was hit hard enough by the log raft to deflect it into the dock without other contributing factors is difficult to determine, but the Court is satisfied that the combination of circumstances and events at the time of the collision of the raft with the Portmar, and immediately before and after such collision, were such as to proximately cause the Portmar to be deflected or moved by the collision and by the action of the stream and by the Portmar's own forward motion into the dock. The faults of the Schafer created the situation which brought about that result without fault on the part of the Portmar.

There is nothing in the record from which the Court finds any fault on the part of those navigating the tug Tussler. The actions of the Tussler in no way contributed to either collision and in any event were proper in dealing with the situation created by the faults of the Schafer.

Inasmuch as the findings made are in a substantial part based on the testimony of the crew of the Schafer and witnesses produced by Schafer, it is not necessary to consider in detail the effect of the nonproduction as witnesses of persons aboard the Portmar. The presumption which arises from the nonproduction of witnesses has been fully overcome by the evidence produced in the case. Redwood S. S. Co. v. United States Shipping Board Emergency Fleet Corp., (The President Lincoln) 9 Cir., 1927, 18 F.2d 382, 383, 1927 A.M.C. 756. Moreover, there is no adequate showing that the witnesses if produced would or could have given testimony of substantial value in determining the controlling facts. No merit is found in the contentions concerning alteration of the records in the engine room bellbook, especially since such entries agree with those in the deck bellbook and the log, neither of which gives any indication of alteration by way of correction or otherwise.