## DIAMOND STATE TEL. CO. v. ATLANTIC REFINING CO. et al.

No. 475 of 1949.

United States District Court
E. D. Pennsylvania.
May 24, 1952.

Benjamin F. Stahl, Jr., and John O. Platt, Jr., Philadelphia, Pa., for plaintiff.

Otto Wolff, Jr., Philadelphia, Pa., for Atlantic Refining Co.

Robert G. Kelly, Philadelphia, Pa., for Martin and Martug Towing Co.

McGRANERY, District Judge.

1. On April 20, 1949, the libellant, Diamond State Telephone Company, was engaged in repairing its submarine telephone cable which extends across the Delaware River from Pigeon Point, Delaware, to Deepwater Point, New Jersey.

2. In order to carry out this work, libellant chartered the scow "Acco" from the Wharton Construction Company, the derrick barge "Contractor" from the Philadelphia Derrick and Salvage Corporation, and the tug "Adriatic" from respondent, P. F. Martin, Inc.

3. The "Acco" and the "Contractor" were chartered to hold the uplifted submarine cable on their decks while the new cable was spliced into it, while the tug "Adriatic" was chartered chiefly to run back and forth between the "Acco" and the "Contractor" with equipment and with libellant's employees and to run errands for libellant between the two vessels and the marine terminal in Wilmington, Delaware.

4. About 7:35 P.M. on April 20, 1949, the tug "Adriatic" in the performance of her designated duties, was attending the scow "Acco". The "Acco" was lying broadside in the channel of Cherry Island Range, about two hundred feet east of the center line of the channel. The "Adriatic" was on the north side of the "Acco" with her bow heading south to hold the scow against the tide.

5. The derrick barge "Contractor" was about six hundred feet east of the "Acco" towards the Deepwater Point shore. The "Contractor" had one end of libellant's submarine telephone cable across her derrick deck, leading out over her stern and down into the river, while the other end of the uplifted cable was lying across the deck of the scow "Acco" extended off the side of the "Acco" and then hit the bottom of the river, while the cable on the deck of the "Contractor" extended off her side at an angle for one hundred feet westward and then hit the bottom of the river.

6. The night was dark, but visibility was good. The three vessels were brilliantly illuminated. The "Acco" had twelve red kerosene lanterns around her guard rail, one red lantern on top of a nine foot cable reel, and two five hundred watt floodlights shining on her deck. The "Contractor" had three red lights in a vertical line in her rigging, with the lowest approximately twenty-five feet above her deckhouse, two floodlights shining on her deck and deck lights around her house. The "Adriatic" had one white mast light, her red and green running lights and lights around her deck.

7. At or about 7:35 P.M., the master of the "Adriatic" noticed a vessel, which later proved to be respondent, Atlantic Refining Company's tanker, the S.S. "W. C. Yeager", approaching upstream. The "Yeager" was about three thousand feet away and was proceeding on a course directly toward the "Adriatic" and the "Acco".

8. When the "Yeager" was about two thousand feet or more away from the "Adriatic", the captain of the tug blew a combination of a danger signal and a signal for a starboard to starboard passing four shorts and two long blasts, to warn the "Yeager" of the danger ahead on the tug's port side and to signal her to pass starboard to starboard.

9. The "Adriatic's" signal was the first signal exchanged between the vessels. The "Adriatic" repeated the danger signals and the starboard to starboard passing signals continuously six or seven times for a period of five minutes.

10. The "Yeager" disregarded the "Adriatic's" signals and continued on her course directly toward the "Adriatic". She finally scraped alongside the "Acco" and hit libellant's cable with a tremendous impact, thereby severing the cable.

11. The captain of the "Yeager" saw the lights of the "Adriatic" and "Acco" when he was between three and four miles away. He did not stop his engines until he was eight hundred feet away from the "Adriatic", when he put his rudder hard left in an attempt to pass to the starboard of the "Adriatic".

12. The "Yeager" was given ample warning by the "Adriatic's" signals that there was danger ahead on the "Adriatic's" port side and the "Yeager" had sufficient time to avoid the cable if she had either stopped and investigated or passed to the starboard side of the "Adriatic".

13. The "Yeager" passed on the New Jersey side of the "Acco" with an initial clearance of fifteen feet of open water between the vessels. As the tanker came in contact with the cable, the "Acco" was whipped around and grazed against the side of the "Yeager".

14. As a result of the collision between the "Yeager" and the cable, certain damage was caused to the "Acco" and its equipment and the cable was damaged at the point of collision and also where the cable was secured to the decks of the "Acco" and the "Contractor".

15. The reasonable cost of repairing the damage to the cable caused by the collision was the sum of $3,185.37.

16. The absence of the lights prescribed by the Pilot Rules for Inland Waters (33 CFR (1949 ed.), Sec. 80.22, p. 122) upon the "Acco" and/or "Adriatic" in no way caused or contributed to the collision or the resultant damage. The brilliant illumination of the scene of the collision, together with the ample warning given the "Yeager" forecloses the possibility that additional lights would have prevented the accident.

### Discussion

Respondents P. F. Martin Co., Inc. and Martug Towing Co. insist that libellant exercised "complete authority and control" over the "Acco"; that libellant ordered the "Acco" and the "Adriatic" to remain in the channel on the night of the accident, knowing that neither vessel had the proper night lights; and that libellant refused an offer by the master of the "Adriatic" to erect proper lights. The libellant, for its part, strenuously contends that it exercised no control whatever over the navigational features of the repair operation. We deem the issue immaterial, and do not decide it. We rest rather upon the rule that the omission of proper lights is disregarded as an element of fault where their display quite obviously could not have prevented the accident, and there was other light in abundance. See, e.g., The Redwood, 9 Cir., 1936, 81 F.2d 680; Socony-Vacuum Oil Co. v. Smith, 5 Cir., 1950, 179 F.2d 672.

### Conclusions of Law

1. This Court has jurisdiction of the subject matter of this case and of the parties.

2. The respondent, Atlantic Refining Company, is solely responsible for the damage to libellant's cable for the following reasons:

(a) The "W. C. Yeager" disregarded the tug "Adriatic's" signals.

(b) The "W. C. Yeager" failed to stop and reverse her engines upon hearing the tug "Adriatic's" signals.

(c) The "W. C. Yeager" failed to exercise proper precautions after seeing the lights of the "Adriatic" and the "Acco".

3. The libellant, Diamond State Telephone Company, is in no way responsible for the collision or damage. Neither was caused or contributed to by the libellant, its employees, servants, or agents.

4. Respondents P. F. Martin, Inc. and Martug Towing Company are not responsible for the collision or damage. Such collision and damage were not caused or contributed to by the respondents P. F. Martin, Inc. and Martug Towing Company, their employees, servants or agents. The libel against them is dismissed.

5. The absence on the "Acco" and/or "Adriatic" of the lights prescribed by the Pilot Rules for Inland Waters in no way caused or contributed to the collision or damage of the cable.

6. Judgment is given in favor of the libellant against respondent Atlantic Refining Company in the sum of $3,185.37, with interest thereon from April 20, 1949 at the rate of 4% per annum and costs.