947 F.2d 83
 1992 A.M.C. 1
 CLIFFS-NEDDRILL TURNKEY INTERNATIONAL-ORANJESTAD, NEDDRILL 2
B.V. and NEDDRILL (NEDERLAND) B.V.,
v.
M/T RICH DUKE, her engines, tackle, apparel, etc., in rem,
Rich Ocean Tankers S.A. and Fuyo Kaiun Co. Ltd., in personam
M/T Rich Duke, Appellant.
 No. 91-3182.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 12, 1991.
Decided Oct. 17, 1991.
 
 Peter M. Sieglaff (Argued), Potter Anderson & Corroon, Wilmington, Del., David E. Black, Griggs & Harrison, Houston, Tex., for appellee.
 Joseph C. Smith, Timothy M. Buck (Argued), Burlingham Underwood & Lord, New York City, Wayne J. Carey, April Caso Ishak, Prickett, Jones, Elliot, Kristol & Schnee, Wilmington, Del., for appellant.
 Before COWEN and NYGAARD, Circuit Judges, and POLLAK, District Judge.*
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 The question presented on this appeal arising out of admiralty is an unusual one: when a ship under way collides with a ship at anchor, can the stationary vessel possibly be at fault under concepts of comparative negligence as applied in admiralty law, even though the moving ship observed the stationary ship well in advance of the allision?[1] Our answer may appear counterintuitive, but we nevertheless determine that in such circumstances the stationary ship can be found to be partially at fault, even though at anchor, when it has violated statutory rules of maritime navigation. Therefore, we will reverse the district court's order of summary judgment against the defendant.
 
 I.
 
 2
 This case involves two ships which should have passed in the night. However, because of a series of miscalculations, they collided.
 
 
 3
 Plaintiffs Cliffs-Neddrill Turnkey International-Oranjestad, Neddrill 2 B.V. and Neddrill (Nederland) B.V.,[2] operated a self-propelled oil drilling ship which was anchored approximately eleven to twelve miles off the west coast of the Netherlands Antilles island of Aruba from December 17, 1989 until January 21, 1990. Defendants M/T Rich Duke, Rich Ocean Tankers S.A. and Fuyo Kaiun Co. Ltd.,[3] operated a large seagoing tank vessel which was carrying a full cargo of crude oil from Lake Maracaibo, Venezuela to Delaware at the time of the allision. The sea lane used by the RICH DUKE and other large seagoing vessels placed it in the vicinity of the NEDDRILL 2. The NEDDRILL 2 was anchored on an easterly heading with its starboard side to the RICH DUKE, which was proceeding in a northerly direction.
 
 
 4
 The anchoring position of the NEDDRILL 2 was provided to Aruban authorities on December 15, 1989. This information was subsequently published in Dutch by the Inspector of Shipping for the Netherlands Antilles in its January 13, 1990 Berichten aan Zeebarenden ("Notices to Mariners"). However, the RICH DUKE, a vessel of Bahamian registry, was manned by a Korean crew, who could only read Korean and English. Consequently, the RICH DUKE was not immediately aware of the NEDDRILL 2's position when it traveled the sea lane off Aruba. To compound the confusion about the NEDDRILL 2's position, the NEDDRILL 2 had not reported its location to the United States Defense Mapping Agency, the organization in charge of disseminating navigational information in the Caribbean Sea through written notices each week and radio broadcasts twice a day.
 
 
 5
 As an anchored vessel, the NEDDRILL 2 was required to display a sequence of navigational lights to inform other vessels that it was anchored and restricted in its ability to maneuver. 33 U.S.C. foll. § 1602, Rules 27(b)(i) and 30(a) (1988). The parties disagree as to whether the NEDDRILL 2 did in fact display those required lights. However, assuming that the required anchor lights were displayed, the RICH DUKE presented evidence that its officers did not see those lights, because those lights were overwhelmed by the intensity of 100 to 150 white work lights (each 500 to 1000 watts in strength) which were positioned on the deck of the NEDDRILL 2 near the required navigational lights.
 
 
 6
 On January 20, 1990, the RICH DUKE departed Venezuela for Delaware. In the dark early morning hours of January 21, the RICH DUKE's second officer, Kwang Hwan Wi, first spotted the NEDDRILL 2 on radar when the oil drilling ship was approximately eleven miles to the north. The RICH DUKE was traveling on autopilot[4] at approximately fourteen knots on a course of 018? . Despite the fact that the RICH DUKE was on a collision course with the NEDDRILL 2, second officer Wi determined that his vessel was the privileged vessel (it had the right of way) in a crossing situation and held his course and speed.[5] Meanwhile, on the NEDDRILL 2, the crewmember assigned the nightwatch on the bridge was tending to other matters and not keeping a constant lookout. At the time, the NEDDRILL 2 was not making security calls on the international bridge-to-bridge VHF radio telephone which would have advised ships 25 miles away of the NEDDRILL's position and the fact that it was an anchored vessel.
 
 
 7
 At a distance of seven miles, the lights of the NEDDRILL 2 were sighted by the RICH DUKE. Realizing that the NEDDRILL 2 was not giving way, second officer Wi adjusted his vessel's course to 025? , a course he calculated would allow the RICH DUKE to pass at a distance of three miles, instead of only one mile at the previous course of 018? . Although Wi had concluded that the NEDDRILL 2 was stationary, second officer Sun-pyeong Pyeon, who relieved Wi shortly before the allision, perceived what he believed was movement when he first observed the NEDDRILL 2 through binoculars.[6] Pyeon adjusted the RICH DUKE's course to 035? when the oil rig was approximately two or three miles away. Unfortunately, this final course change had the effect of steering the RICH DUKE directly into the NEDDRILL 2.
 
 
 8
 At this point, the Automatic Radar Plotting Aid (ARPA) alarm on the RICH DUKE warned Pyeon of a possible collision. When the two ships were only 400 meters apart, Pyeon ordered the RICH DUKE swung manually hard to starboard. However, the two vessels were already too close to avoid allision, and the port quarter of the RICH DUKE struck the starboard bow of the NEDDRILL 2. During the entire time that the two ships drew close, there was absolutely no communication between them, whether by radio, lights, or warning sounds.[7]
 
 
 9
 The NEDDRILL 2 filed suit in district court against the RICH DUKE. The RICH DUKE was arrested when it arrived in Delaware. Plaintiffs moved for summary judgment on the issue of liability, claiming that the RICH DUKE was solely responsible for the allision. The district court judge granted plaintiff's motion for summary judgment, Cliffs-Neddrill Turnkey v. M/T Rich Duke, 760 F.Supp. 392 (D.Del.1991), implicitly concluding that even under concepts of comparative negligence, the RICH DUKE was 100 percent responsible for the allision as a matter of law. The RICH DUKE appeals.
 
 
 10
 The district court had jurisdiction under 28 U.S.C. § 1333(1) (1988). We have jurisdiction to review the judgment of the district court pursuant to 28 U.S.C. § 1291 (1988). At issue is whether summary judgment was properly granted by the district court. The RICH DUKE alleges that the NEDDRILL 2 violated its statutory duty of care by obscuring required anchoring and "restricted in ability to maneuver" lights (if in fact such lights were in place) with 100 to 150 bright work lights, and failing to post a proper lookout. Our analysis begins by examining the relevant standards and presumptions in admiralty collision cases. We then will apply these standards to the two statutory violations which, the RICH DUKE asserts, were committed by the NEDDRILL 2. Finally, we will examine whether there remain any material disputed facts which preclude summary judgment.
 
 II.
 
 11
 The International Regulations for Preventing Collisions at Sea are an internationally recognized body of rules which have been accepted by most maritime nations, including the United States. Thomas J. Schoenbaum, Admiralty and Maritime Law 446 (1987). These regulations, codified at 33 U.S.C. foll. § 1602, "are not mere prudential regulations or guidelines; they are binding enactments that must be adhered to closely." Id. All parties in this case agree that these International Regulations govern their conduct.
 
 
 12
 Initially, there is a presumption that a moving vessel which strikes a stationary vessel is at fault. The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895). This presumption, however, is not absolute. It can be overcome by proving that the moving vessel was without fault, the stationary object was at fault, or the collision was inevitable. Bunge Corp. v. M/V Furness Bridge, 558 F.2d 790, 795 (5th Cir.1977), cert. denied sub nom., Furness Withy & Co. v. Bunge Corp., 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978). An essential factor in the determination of fault in admiralty collisions is the well-recognized Pennsylvania Rule:
 
 
 13
 The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.
 
 
 14
 The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874) (emphasis added). For the NEDDRILL 2 to prevail on summary judgment, it must prove that any statutory violations on its part "could not have been" a cause of the accident. We interpret The Pennsylvania Rule, as have other courts of appeals, to require a clear and convincing showing that the violation by the NEDDRILL 2 could not have been a proximate cause of the collision. See, e.g., Trinidad Corp. v. S.S. Keiyoh Maru, 845 F.2d 818, 825 (9th Cir.1988).
 
 
 15
 The requirements for a grant of summary judgment are demanding. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2511-12, 91 L.Ed.2d 202 (1986) (trial court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it so one-sided that one party must prevail as a matter of law"). In assessing what constitutes a "genuine issue of material fact," the trial court must look to the governing substantive law and what "disputes over facts [would] affect the outcome of the suit" under that law. Id. at 248, 106 S.Ct. at 2510. Admiralty collision cases are governed by comparative negligence principles, United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), and, therefore, any degree of fault which could affect an allocation of liability would preclude summary judgment. Whether a statutory violation constitutes fault under the rigorous Pennsylvania standard, see Boyer v. The Merry Queen, 202 F.2d 575, 579 (3d Cir.1953) (" 'Would not' must go a long way before it becomes 'could not,' in satisfaction of the rule of The Pennsylvania."), is a factual question which usually can be resolved only after a full trial. Therefore, when a party who has committed a statutory violation seeks summary judgment in an admiralty collision case, that party has difficult, albeit not insurmountable, obstacles to overcome.
 
 A.
 
 16
 The most significant statutory violation alleged by the RICH DUKE is the NEDDRILL 2's obscuring or failure to display proper anchoring lights as set forth in 33 U.S.C. foll. § 1602. Rule 27(b)(i) requires that "a vessel restricted in her ability to manoeuvre" must display a sequence of red, white, and red lights in a vertical line. Furthermore, anchored vessels must also display a round white light at both the bow and stern of the ship under Rule 30(a). These rules are meant to be absolute:
 
 
 17
 The Rules concerning lights shall be complied with from sunset to sunrise, and during such times no other lights shall be exhibited, except such lights as cannot be mistaken for the lights specified in these Rules or do not impair their visibility or distinctive character, or interfere with the keeping of a proper look-out.
 
 
 18
 33 U.S.C. foll. § 1602, Rule 20(b) (emphasis added).
 
 
 19
 It is the contention of the RICH DUKE that the NEDDRILL 2 failed to display the required lights or, if it did, the brighter working lights obscured them by "impair[ing] their visibility or distinct character." Id. The question is whether the failure of the NEDDRILL 2 to display the required navigational lights could be a contributing proximate cause of the allision, since there is no question that the RICH DUKE first visually observed the NEDDRILL 2 at a distance of seven miles prior to the allision. Since the required lights are meant to provide guidance to approaching vessels as to a vessel's size, course, heading, and type of operations, we cannot conclude as a matter of law, as did the district court, that failure to properly display lights could not have been a contributing proximate cause of the allision.
 
 
 20
 The rationale behind lighting requirements for vessels under way is equally applicable when one vessel is at anchor:
 
 
 21
 If maritime collisions are to be avoided, knowledge of the character and course of oncoming vessels is indispensable. The light rules embody an elaborate code designed to convey that information. The extreme blackness of water at night makes any departure from light rules 'one of the most wrecklessly [sic] unlawful acts a vessel can commit.'
 
 
 22
 First Nat'l Bank of Chicago v. Material Service Corp., 597 F.2d 1110, 1118 (7th Cir.1979) (citation omitted). Had the RICH DUKE seen proper anchor lights on the NEDDRILL 2, it would have known that it was not the privileged vessel in a crossing situation. Under such circumstances, the RICH DUKE could have adjusted its course sooner or taken other action. "Who can say that, given the additional time, those measures [to avoid a collision] would not have been successful? The very fact that that question may properly be asked seems to us to show that the [ship in violation of a statute] has not sustained her burden." The Merry Queen, 202 F.2d at 579. The RICH DUKE's sighting of the NEDDRILL 2 from seven miles away may well have been meaningless if the RICH DUKE did not know what the NEDDRILL 2 was doing.
 
 
 23
 This court recognized the importance of navigational lights in Diamond State Tel. Co. v. Atlantic Refining Co., 205 F.2d 402 (3d Cir.1953). In Diamond State, a tanker struck an underwater telephone cable which was under repair by two barges and a tug. Although we noted that the stationary flotilla was "lit up like a Christmas tree," id. at 406, we found it significant that the tug and one of the barges were not displaying the required lights of vessels engaged in cable laying. We concluded in that case, as we conclude here, that proper navigational lights on anchored vessels provide crucial information to approaching vessels:
 
 
 24
 [The district court found that] the absence of the three red lights called for by the Pilot Rules could not have contributed to the accident. We would agree, if the only purpose of the three red lights was to provide illumination. The other lights that were showing told the [tanker] Yeager that the flotilla was there, and, as to it, the Yeager navigated successfully. Had the required lights been displayed, the Yeager would have been told, not only that the flotilla was there, but also what it was doing there.
 
 
 25
 Id. See also The Chester O. Swain, 76 F.2d 890, 892 (2d Cir.1935) (burden on ship with non-regulation "makeshift lights" to prove other ship was not confused). Not only would a complete failure to display proper lights constitute a statutory violation, but a violation could result from obscuring of the required lights by an opaque object or brighter lights. Cf. American Dredging Co. v. Calmar S.S. Corp., 121 F.Supp. 255 (E.D.Pa.1954) (mud scow at fault for not exhibiting required lights at sufficient height above hull of scow), aff'd, 218 F.2d 823 (3d Cir.1955) (per curiam).
 
 
 26
 The sole case cited by the NEDDRILL 2 to support its position that improper anchor lights do not necessarily establish negligence when the anchored vessel is in full view and observed by the moving vessel is P. Dougherty Co. v. United States, 168 F.2d 464 (2d Cir.1948), aff'g, The Wilmington, 70 F.Supp. 834 (E.D.N.Y.1946). We do not find the holding of that case to be persuasive, since the facts of P. Dougherty are not similar to our case. P. Dougherty involved an allision between a barge and the submarine U.S.S. Chewink. The Chewink was anchored in Long Island Sound, a body of water where, unlike the heavily trafficked sea lane off Aruba, anchored vessels would be expected. The Chewink also lacked the sophisticated detection and signalling devices of the NEDDRILL 2. Most significantly, P. Dougherty was decided after trial, not on summary judgment.
 
 
 27
 All three cases cited by the district court to support its finding that the obscured lights were not a proximate cause of the allision, Pacific Tow Boat Co. v. States Marine Corp., 276 F.2d 745 (9th Cir.1960); Diamond State, supra; P. Dougherty Co., supra, were cases decided not on summary judgment but after trial. In Diamond State, we recognized that whether "the absence of the three red [navigational] lights was not a causal factor was a conclusion of ultimate fact." Diamond State, 205 F.2d at 409 (emphasis added). As we explained in Part II of this opinion, as a general matter, this type of admiralty collision case is not appropriately decided by summary judgment. In so deciding, we nevertheless agree with the district court's finding that The Pennsylvania rule was not meant to be "a hard and fast rule" that requires a finding of fault for statutory violations "no matter how speculative, improbable, or remote." Cliffs-Neddrill, 760 F.Supp. at 398 (quoting Board of Comm'rs v. M/V Farmsum, 574 F.2d 289, 297 (5th Cir.1978)). The facts of this case force us to conclude that the improper display of anchoring lights by the NEDDRILL 2 was not just a "speculative, improbable, or remote" cause of the allison. We recognize, however, that in those cases in which a violation of the International Regulations cannot be said to have played any role in a collision or allision, summary judgment still remains available.
 
 
 28
 Although a layperson might not fully comprehend the significance of navigational lights when the vessel with improper lights is in full view for seven miles, we are not in a position to say that the required lights would have been meaningless to an experienced ship officer. Whether it was prudent for the second officer of the RICH DUKE to change course from 025? to 035? given the NEDDRILL 2's misleading lights is a question of fact. We certainly cannot conclude as a matter of law that had the anchoring lights been clearly visible, the accident would have occurred in any event.
 
 B.
 
 29
 The RICH DUKE also alleges that the NEDDRILL 2's failure to post a proper lookout constituted a statutory violation of the International Regulations, which state that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 U.S.C. foll. § 1602, Rule 5 (emphasis added). The Supreme Court has long been a proponent of the lookout requirement:
 
 
 30
 The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of his vessel with all the property and the lives of all on board. The same consequence may ensue to the vessel with which his shall collide. In the performance of this duty the law requires indefatigable care and sleepless vigilance.
 
 
 31
 The Ariadne, 80 U.S. (13 Wall.) 475, 478, 20 L.Ed. 542 (1872) (emphasis added). The lookout requirement has been extended to anchored vessels. The "Clara", 102 U.S. (12 Otto) 200, 26 L.Ed. 145 (1880) (anchored schooner at fault for not having lookout at night when struck and sunk by another vessel in a crowded body of water). In determining fault, the failure to post an effective lookout is a statutory violation which implicates The Pennsylvania rule. Trinidad Corp., 845 F.2d at 826 ("failure to post a lookout raises a presumption of negligence under The Pennsylvania rule").
 
 
 32
 "It is axiomatic that an 'inefficient lookout is equivalent to none.' " In re Complaint of Interstate Towing Co., 717 F.2d 752, 755 (2d Cir.1983) (quoting Sun Oil Co. v. S.S. Georgel, 245 F.Supp. 537, 545 (S.D.N.Y.1965), aff'd, 369 F.2d 406 (2d Cir.1966) (per curiam)). Although the effectiveness of a lookout is an issue which usually can be decided only after a full trial, a review of the record indicates that the NEDDRILL 2 did not have a proper lookout. The navigation bridge of the NEDDRILL 2 was unmanned for a substantial period prior to the accident. The bridgewatch was assigned to a drilling company employee, who was in charge of positioning the vessel during drilling operations. This drilling company employee was not a licensed deck officer and not even on the bridge at the time of the allision--he was in a room aft of the bridge where he was typing a daily report. Such conduct is not the stuff of which a proper lookout is made. See United States v. Adams, 376 F.2d 459, 461 (3d Cir.1967) ("Proper lookouts are competent persons other than the master and helmsman, properly stationed for that purpose....") (quoting The Ottawa, 70 U.S. (3 Wall.) 268, 273, 18 L.Ed. 165 (1865)) (emphasis added). As the record indicates, the man actually assigned the bridgewatch was unaware that he was to keep a lookout, uninformed about the International Regulations, and did not know what navigation lights the NEDDRILL 2 was displaying. Certainly, this crew member was not a lookout "of suitable experience, properly stationed on the vessel, and actually and vigilantly employed in the performance of that duty." Chamberlain v. Ward, 62 U.S. (21 How.) 548, 570, 16 L.Ed. 211 (1859).
 
 
 33
 Despite the unambiguous dictates of Rule 5 and the precedents cited above, the district court concluded that "it was not unreasonable for the NEDDRILL 2 to dispense with a constant lookout" since it was a clear night and the NEDDRILL 2 was brightly lit. Cliffs-Neddrill, 760 F.Supp. at 399. We disagree. A lookout is most necessary at night and other times when visibility is low, see Allied Chemical Corp. v. Hess Tankship Co., 661 F.2d 1044, 1053 (5th Cir.1981) (failure to post lookout in fog was negligent), and when a vessel is in an area with heavy traffic. See Arabian American Oil Co. v. Hellenic Lines, Ltd., 633 F.Supp. 659, 668 (S.D.N.Y.1986) (failure to post lookout on bow was negligent when traveling through hazardous waters). On a vessel not restricted in its ability to maneuver, a vigilant lookout enables the ship to adjust its course or speed to avoid an approaching ship. The NEDDRILL 2 argues, however, that a lookout on an anchored vessel is helpless to prevent an allision. On the contrary, the primary function of a lookout on a stationary vessel is to sight approaching ships and their navigation lights, listen and watch for warning signals well in advance of a possible allision, and communicate to other ships through radio, signalling lights, or whistles. Here, the NEDDRILL 2 made no attempt to communicate with the RICH DUKE. See Allied Chemical Corp., 661 F.2d at 1054 (failure of anchored vessel to broadcast security calls to other ships in the vicinity was negligent). Although it is true that the RICH DUKE also made no attempt to contact the NEDDRILL 2 prior to the allision, this fact is relevant only in allocating liability under comparative negligence, not in determining fault in a motion for summary judgment.
 
 
 34
 Given that the NEDDRILL 2 was anchored in a heavily trafficked sea lane, a proper lookout as dictated by Rule 5 was necessary in the early morning hours of January 21, 1990. We find that there is presented a question of fact whether the failure to properly post a lookout proximately contributed to the happening of the allision.
 
 III.
 
 35
 Finally, there is the question whether other genuine issues of material fact exist which preclude summary judgment. The RICH DUKE argues two other factual issues. It asserts that the NEDDRILL 2 failed to use its radar to track other vessels in the vicinity, and it failed to report its anchored location to the U.S. Defense Mapping Agency, which provides nautical charts and marine navigation data to navigators worldwide. In determining whether disputed facts exist, we must view all facts and inferences to be drawn from those facts in the light most favorable to the nonmoving party, the RICH DUKE. See Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir.1986).
 
 
 36
 The RICH DUKE asserts that the NEDDRILL 2 failed to take action to prevent the allision. Rule 7(a) of the International Regulations states: "Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists." 33 U.S.C. foll. § 1602, Rule 7(a). Specifically, the RICH DUKE argues that the NEDDRILL 2 failed to use its two radars to track the approach of the RICH DUKE. If true, this failure could constitute a statutory violation of Rule 7(b), which requires: "Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects." 33 U.S.C. foll. § 1602, Rule 7(b). Had the NEDDRILL 2 used its radar, the RICH DUKE argues, it would have been able to contact the RICH DUKE well in advance of the allision. The NEDDRILL 2 had at its disposal a wide array of communication devices, none of which it used prior to the allision. On this issue, the RICH DUKE is not without fault, since its ARPA radar was turned off for most of second officer Wi's command. Second officer Pyeon turned the radar on when he relieved Wi, but turned it off when the alarm sounded after the RICH DUKE's course was adjusted to 035? . On remand, the failure of both vessels to use radar or other available navigation equipment needs to be developed more fully.
 
 
 37
 The NEDDRILL 2's failure to report its position to the U.S. Defense Mapping Agency (DMA) is also in dispute. The NEDDRILL 2 argues that it reported its anchoring position to the Dutch authorities--a sensible move, it asserts, since the oil drilling rig was in Dutch waters. This information was subsequently published in a Dutch publication. The RICH DUKE, however, had seamen who could read only English and Korean. Had the RICH DUKE learned the location of the NEDDRILL 2 from the DMA, its officers could have plotted a course line well clear of the NEDDRILL 2. Whether it was more appropriate for the NEDDRILL 2 to report its location to Dutch authorities instead of the DMA is a genuine issue of material fact. Given that the NEDDRILL 2 was anchored in a sea lane used by vessels of all nationalities, see Arabian American Oil Co., 633 F.Supp at 669-70 (oil platform at fault for not reporting its presence to navigational authorities), its failure to report its location to as many authorities as possible may have been negligence which contributed to the allision. We think it is significant that the NEDDRILL 2 reported its location to the DMA on both prior and subsequent occasions, but did not do so on this occasion. While we note that standards of care can derive not only from statutes but also from "general concepts of prudent seamanship and reasonable care,"[8] Schoenbaum, supra, at 444, we express no opinion concerning the NEDDRILL's failure to inform the DMA. What constitutes "prudent seamanship and reasonable care" is clearly a factual determination. We leave this issue to be resolved upon a fully developed record.[9]
 
 IV.
 
 38
 This opinion is not meant to suggest that the NEDDRILL 2 was at fault. Indeed, the actions of the RICH DUKE--its steering directly into the NEDDRILL 2, its constant speed on autopilot, its failure to use radar, and its failure to communicate with the NEDDRILL 2--may very well have been the sole cause of the allision. However, because we are unable to say that the statutory violations of the NEDDRILL 2 "could not have been" a cause of the accident, we will reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.
 
 
 
 *
 Hon. Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 An allision is the "running of one vessel into or against another, as distinguished from a collision, i.e., the running of two vessels against each other. But this distinction is not very carefully observed." Black's Law Dictionary 75 (6th ed. 1990). Our use of the verb "collide" in this opinion is not meant to imply that the stationary vessel was actually under way
 
 
 [2]
 Although there are several plaintiffs to this action, for purposes of clarity, we will hereafter refer to them all as the NEDDRILL 2
 
 
 [3]
 We will hereafter refer to the several defendants as the RICH DUKE
 
 
 [4]
 The RICH DUKE continued on autopilot at a speed of fourteen knots, never slowing down, until shortly before the allision
 
 
 [5]
 The RICH DUKE was the privileged vessel under Rule 15 of the International Regulations. 33 U.S.C. foll. § 1602. Under Rule 17, the privileged vessel is required to maintain its course and speed unless it becomes apparent that the burdened vessel (the NEDDRILL 2) is not taking steps to avoid collision
 
 
 [6]
 The miscalculations were in part the result of the three-knot current and a strong easterly wind of thirty-five knots, which had the effect of setting the RICH DUKE to the west of her course line. Pyeon also thought the NEDDRILL 2 was being pushed by a tug, though he never saw a tug, nor did he see any running lights on the NEDDRILL 2 which would indicate that it was underway
 
 
 [7]
 The NEDDRILL 2 was equipped with a Morse signalling lamp and a light permanently mounted on her mast, both of which would have allowed it to signal to the RICH DUKE
 
 
 [8]
 Rule 2(a) of the International Regulations requires that a vessel should not be excused "from the consequences of any neglect to comply with these rules or of the neglect of any precaution which may be required by the ordinary practice of seaman, or by the special circumstances of the case."
 
 
 [9]
 Since a failure to notify the proper authorities of position does not seem to be a statutory violation per se, the burden is on the RICH DUKE to prove that this failure was a cause of the accident. Capt'n Mark v. Sea Fever Corp., 692 F.2d 163, 168 (1st Cir.1982)